USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/09/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MALCOLM GREER,

                              Plaintiff,

         -against-

VILLAGE OF SCARSDALE, et al.,

                              Defendants.

No. 22-cv-7322 (NSR)

**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge:

Plaintiff Malcom Greer ("Plaintiff"), who is African American, brings this action pursuant to 42 U.S.C. § 1983 against the Village of Scarsdale (the "Village") and Police Chief Andrew Matturro, alleging violations of his rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Plaintiff contends, among other things, that he was demoted from the rank of Sergeant on the basis of racial discrimination. Presently before the Court is Defendants' Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. (ECF No. 62.)

For the following reasons, Defendants' motion is GRANTED.

## FACTUAL BACKGROUND

The following facts are drawn from Defendants' Statement of Material Facts submitted pursuant to Local Civil Rule 56.1 and are deemed admitted except where properly controverted by Plaintiff's Rule 56.1 counterstatements with citation to admissible evidence. Although Plaintiff submitted extensive counterstatements, many do not directly address the asserted facts, instead denying them as false, interjecting narrative argument, or offering subjective interpretations to the record evidence. (*See generally* ECF No. 70, "Pl. Counter 56.1.")

Local Civil Rule 56.1 requires a response that "specifically controvert[s]" each factual assertion with citation to admissible evidence. Local Civ. R. 56.1(c), (d). Argumentative commentary, legal conclusions, or extraneous narrative do not create genuine disputes of material fact. *See Costello v. N.Y. State Nurses Ass'n*, 783 F. Supp. 2d 656, 661 n.5 (S.D.N.Y. 2011) (disregarding Rule 56.1 responses consisting of "conclusory assertions" or "legal arguments" rather than proper factual disputes); *Baity v. Kralik*, 51 F. Supp. 3d 414, 417–19 (S.D.N.Y. 2014) (deeming facts admitted where responses were argumentative or failed to properly controvert asserted facts). This is not the first instance in which Plaintiff's counsel has been cautioned regarding noncompliant Rule 56.1 submissions. *See Pinkham v. Rivers*, 2026 WL 446235, at *1 (S.D.N.Y. Feb. 17, 2026); *Baity*, 51 F. Supp. 3d at 417–18. The Court will not sift through improper responses to manufacture disputes on Plaintiff's behalf.[1] To the extent Plaintiff's Rule 56.1 responses fail to directly and properly dispute Defendants' factual assertions with citation to admissible evidence, those facts are deemed admitted.

## I.    The Village and Its Policymaking Structure

The Village operates its own Police Department (the "Department"). (ECF No. 63, "Defs.' 56.1," ¶ 1.) Between January 2015 and February 1, 2025, Chief Matturro served as the Department's Chief of Police. (*Id.* ¶ 2.) In this position, Chief Matturro did not have the legal authority to hire, terminate, promote, or demote employees. (*Id.* ¶ 3.) Instead, he made recommendations to the Village Manager, Mayor, or Village Board, who served as the relevant

---

[1] The same is true of Plaintiff's opposition brief. Throughout the brief, Plaintiff's counsel advances various factual assertions without citation to the record. To permit meaningful review—and to ensure the Court considers the evidence in the light most favorable to Plaintiff—counsel must provide a citation to admissible evidence for each asserted fact. This principle applies equally to Plaintiff's legal arguments; counsel must provide supporting authority when advancing a proposition of law. For example, Plaintiff asserts that Officer Wanderman, who replaced Plaintiff as Sergeant, is not a member of the same protected class because she is only half African American. (ECF No. 69, "Pl. Opp.," at 19.) Yet counsel provides no case law to support that contention, even while asserting that "as a matter of law, [Defendants'] argument fails." (*Id.*) Such unsupported legal conclusions do not suffice.

policymakers. (*Id*.) Although Chief Matturro lacked formal legal authority to take these actions, there have been instances—such as here—in which he was aware that the Village Manager would accept his recommendations. (ECF No. 67, "Sussman Aff.," Ex. 1, Matturro Dep. Tr. 81:21–82:2.)

## II.    Plaintiff's Employment History and Training Requests

Plaintiff, who is African American, is currently employed by the Department. (Defs.' 56.1 ¶ 4.) Plaintiff began his employment as a Police Officer in 2013. (*Id*.) During Plaintiff's tenure as a Police Officer, and later as a Sergeant, he applied for various Department trainings. (ECF No. 68, "Pl. Aff.," ¶ 40.) For instance, Plaintiff expressed interest in completing motorcycle riding, patrol, firearms instructor, and defensive tactics instructor trainings. (*Id*.) Plaintiff alleges that he was denied these trainings throughout his tenure with the Department, while colleagues who were Caucasian were offered such trainings. (*Id*.) However, Plaintiff has received several forms of training, including supervisors' school, emergency medical technician ("EMT"), and other generalized training, totaling more than 250 hours. (Defs.' 56.1 ¶¶ 130–32.)

According to Plaintiff, Chief Matturro participated in denying all of Plaintiff's requests for training and so admitted at his deposition. (Pl. Aff. ¶ 48.) During his deposition, Chief Matturro testified that he was "[n]ot as much involved" in the "decision process" regarding Plaintiff's training. (Matturro Dep. Tr. 140:21–23.) He did admit, however, that he was directly involved in permitting Plaintiff to attend the EMT training. (*Id*. Tr. 140:24–141:3.) He also testified that there may have been occasions when he was involved in the decision process, but he could not recall any discussions with Plaintiff. (*Id*. Tr. 141:4–14.)

## III.    Plaintiff's Promotion to Sergeant

On October 7, 2021, Chief Matturro announced that one eligible candidate would be promoted to fill a vacancy in the rank of Sergeant. (Defs.' 56.1 ¶ 6.) Chief Matturro requested

3

recommendations from all supervisors for one of three candidates: (1) Plaintiff; (2) Officer Brett Purpura, who is Caucasian; and (3) Officer Victoria Wanderman, who is half Caucasian and African American. (*Id.*) Plaintiff received three recommendations from his supervisors, Capt. Edward Murphy, Det. Lt. Brendan Kellaher, and Sgt. Michael Siciliano, all of whom were Caucasian. (*Id.* ¶ 7.) Plaintiff was interviewed for the position. (*Id.* ¶ 8.) At the conclusion of the interview process, Chief Matturro recommended to the Village Manager, Robert Cole, that Plaintiff be promoted to the rank of Sergeant. (*Id.* ¶ 9.) Village Manager Cole approved Plaintiff's promotion on October 14, 2021. (*Id.* ¶ 11.)

On October 15, 2021, Plaintiff met with Chief Matturro and other supervisors, who informed him that he would be promoted to Sergeant effective October 28, 2021. (*Id.* ¶ 12.) Chief Matturro explained to Plaintiff that he was selected because of his work, evaluations, performance, and success in his testing. (*Id.* ¶ 14.) Chief Matturro also advised Plaintiff that, as a result of his promotion, he would be in charge of the police officers below him. (*Id.* ¶ 15.) Chief Matturro was "confident" that Plaintiff would be successful. (*Id.*) However, Plaintiff was warned that he was "going to be on probation" and that he had "seen people not make it through probation." (ECF No. 64, "Berlin Decl.," Ex. O.) Before the meeting concluded, Chief Matturro informed Plaintiff of certain concerns that had arisen during the promotion process. (Defs.' 56.1 ¶ 18.) For instance, Chief Matturro told Plaintiff that the Department was aware that some individuals believed he spoke differently with members of the community than with the Department's Command Staff. (*Id.* ¶ 19.) Because Plaintiff did not trust his supervisors, he secretly recorded this and several other meetings. (*Id.* ¶ 13.)

Pursuant to Westchester County Civil Service Rules, Plaintiff was subject to a 52-week probationary period as a Sergeant. (*Id*. ¶ 25.) Plaintiff's employment could be terminated, or he could be demoted at any time during this probationary period. (*Id*. ¶ 26.)

## IV.    Plaintiff's Tenure as Sergeant and Subsequent Investigation

Plaintiff appeared to have a strong start as Sergeant. On January 15, 2022, he received a performance review from one of his supervisors, Lt. Steven DelBene, covering the period from October 2021 through December 2021. (Defs.' 56.1 ¶ 27.) He was informed that he was both meeting and exceeding standards. (*Id*.) Shortly thereafter, Plaintiff took an approved leave of absence from April 3, 2022, through May 6, 2022. (*Id*. ¶ 28.) The leave was for attendance at a 120-hour training program at the Westchester County Police Academy, which ran from April 18, 2022, through May 6, 2022. (*Id*.) This caused Plaintiff to miss his subsequent performance review with Lt. DelBene. (*Id*. ¶ 30.) Plaintiff testified that he attempted to reschedule the meeting, but Lt. DelBene informed him that he was too busy. (Sussman Aff., Ex. 2, Pl. Dep. Tr. 102:12–103:6.)

After Plaintiff returned to work, on May 26, 2022, Lt. DelBene spoke with Chief Matturro regarding Plaintiff's performance. (Defs.' 56.1 ¶ 32.) Specifically, Officer Jamie Bell reported to Lt. DelBene that Plaintiff had been treating her unfairly based on her sex. (*Id*. ¶¶ 33–35.) For instance, Officer Bell reported that Plaintiff would refer to her as "Ms. Bell" or "young lady," while male officers were addressed by their proper titles. (Berlin Decl., Ex. W at 2.) Lt. DelBene also informed Chief Matturro of another incident between Plaintiff and Dispatcher Esther Davis. (*Id*.) Specifically, on May 15, 2022, Dispatcher Davis refused to inform Plaintiff where she was going when leaving the Department's communications room. (Sussman Aff., Ex. 4.) Another officer in the room reported that Dispatcher Davis acted "slightly unprofessional." (*Id*.) That same officer,

however, also confirmed that Plaintiff spoke about "prostitutes in the Dominican Republic, and [how] he will travel to the Dominican Republic in the future." (*Id*.)

Pursuant to Village and Department policies, Lt. DelBene commenced an investigation with respect to the allegations made against Plaintiff. (Defs.' 56.1 ¶¶ 42–44; Berlin Decl., Ex. W.) Given that the alleged behavior involved violations of sexual harassment, Chief Matturro informed the Village's Director of Personnel and Human Resources. (Defs.' 56.1 ¶ 45.) Plaintiff does not dispute that an investigation was commenced against him. (*Id*. ¶¶ 43–44.) However, he alleges that the Village and Department policies were not uniformly enforced. (*See, e.g.*, Pl. Aff. ¶ 10.) For example, Plaintiff alleges that he made several allegations regarding other Department personnel—specifically Sgts. Siciliano and Ronnie Arefieg—for racial discrimination, yet no investigation was conducted. (*Id*.)

On June 1, 2022, Plaintiff met with Chief Matturro, Lt. DelBene, and Capt. Murphy. (Defs.' 56.1 ¶ 46.) During this meeting, Chief Matturro informed Plaintiff that certain sexual harassment allegations were made against him, and that an investigation had commenced to determine their validity. (*Id*. ¶¶ 47–48.) Chief Matturro further explained that, while Plaintiff was permitted to correct officers who were not following procedure, he was prohibited from doing so in a disparate, abusive, or condescending manner. (*Id*. ¶ 50.) In response, Plaintiff expressed that he had not been given the tools needed to be a successful Sergeant and that his supervisors had not supported him. (*Id*. ¶ 51.) According to Plaintiff, he had raised such concerns to Lt. DelBene, (Pl. Aff. ¶ 12), who allegedly ignored them, but had never raised them with Chief Matturro until this meeting. (Defs.' 56.1 ¶ 52.) Chief Matturro nonetheless confirmed to Plaintiff that nothing was final and that the matter would be investigated further. (*Id*. ¶¶ 53–54.) Plaintiff was also informed that he would be interviewed concerning this behavior on a later date. (*Id*. ¶ 48.)

After the meeting, Lt. DelBene continued to investigate the allegations made against Plaintiff. (*Id*. ¶ 56.) In conducting his investigation, Lt. DelBene interviewed several Department personnel, including (1) Sgt. Siciliano, (2) Dispatcher Davis, (2) Officer Bell, (4) Officer Fitzsimmons, (5) Officer Sordellini, and (6) Officer Sullivan. (*Id*. ¶¶ 56, 63, 66.) Each of these witnesses, in one way or another, collaborated the sexual harassment allegations made against Plaintiff. (*See, e.g.*, ¶¶ 58–66.) Plaintiff was also interviewed. (*Id*. ¶ 60.) Lt. DelBene proceeded to create two investigatory reports, the "SPD-130" and "SPD-131," in addition to memoranda, summarizing his interviews and conclusions. (*Id*. ¶¶ 63–64.) Once finalized, Lt. DelBene presented the investigatory material to Chief Matturro for review. (*Id*. ¶ 68.) Chief Matturro did not conduct the investigation, nor did he interview the witnesses. (Berlin Decl., Ex. W.) He only reviewed Lt. DelBene's investigatory reports and memoranda. (*Id*.)

Upon reviewing Lt. DelBene's investigatory reports and memoranda, Chief Matturro concluded that the allegations made against Plaintiff were well-founded and approved the reports. (Defs.' 56.1 ¶ 69.) On July 22, 2022, Chief Matturro met with Plaintiff, Lt. DelBene, and Det. Lt. Kellaher to discuss the investigatory findings. (*Id*. ¶ 71.) Chief Matturro presented Plaintiff with the investigatory reports, and Plaintiff denied all wrongdoing. (*Id*. ¶¶ 72, 75, 78.) In fact, Plaintiff alleges a variety of deficiencies in Lt. DelBene's investigation, including that he failed to corroborate witness accounts or provide sufficient evidence that Plaintiff made inappropriate comments. (*See, e.g.*, Pl. Counter 56.1 ¶¶ 48, 51–52, 66, 69–70.)

Toward the end of the meeting, Chief Matturro informed Plaintiff that he had not treated his subordinates with respect and, as a result, would be recommending his demotion to Village Manager Cole. (Defs.' 56.1 ¶¶ 74, 77.) On the same date, Chief Matturro prepared a memorandum to Village Manager Cole recommending that Plaintiff be demoted from Sergeant to Police Officer.

(Berlin Decl., Ex. AG at 2.)  The memorandum also stated, among other things, that Plaintiff failed to "acknowledge any wrongdoing or take any responsibility for his actions."  (*Id*.)  On August 1, 2022, Village Manager Cole approved Chief Matturro's recommendation to demote Plaintiff.  (Defs.' 56.1 ¶ 84.)  Plaintiff subsequently met with Village Manager Cole, who informed him of his official demotion on August 9, 2022.  (*Id*.)  This all occurred during Plaintiff's probationary period.  (*Id*. ¶ 4.)

Due to Plaintiff's demotion, Chief Matturro directed Department supervisors to recommend a new police officer to be elevated to Sergeant.  (*Id*. ¶ 95.)  Following interviews, Chief Matturro ultimately recommended Officer Wanderman, who, as stated earlier, is half Caucasian and African American.  (*Id*. ¶ 96.)  Village Manager Cole approved Chief Matturro's recommendation, and Officer Wanderman was promoted to Sergenat effective September 14, 2022.  (*Id*. ¶¶ 97–98.)

## PROCEDURAL HISTORY

Plaintiff commenced this action on August 26, 2022.  (ECF No. 1.)  Shortly thereafter, Defendants filed an Answer to the Complaint on November 3, 2022.  (ECF No. 17.)  After a failed attempt at mediation and the completion of discovery, Defendants moved for summary judgment on July 22, 2025, submitting a memorandum of law and a Rule 56.1 Statement of Material Facts in support.  (ECF Nos. 62–66.)  Plaintiff opposed the motion and submitted counterstatements pursuant to Local Rule 56.1.  (ECF Nos. 67–70.)  Defendants then filed replies in further support of their motion.  (ECF No. 73.)

## LEGAL STANDARD

### I.    Federal Rule of Civil Procedure Rule 56

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of pointing to evidence in the record, inclusive of deposition testimony, documents, affidavits, and declarations, *id.* at 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may support an assertion that there is no genuine dispute of a particular fact by "showing… that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). If the moving party fulfills its preliminary burden, the onus then shifts to the nonmoving party to raise the existence of a genuine issue of material fact. Fed. R. Civ. P. 56(c)(1)(A); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Courts must "draw all rational inferences in the non-movant's favor" while reviewing the record. *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 224 (2d Cir. 2014) (citing *Anderson*, 477 U.S. at 248). Importantly, "the judge's function is not himself to weigh the evidence and determine the truth of the matter," nor is it to determine a witness's credibility. *Anderson*, 477 U.S. at 249; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (noting that "[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment"). Rather, in answering the primary inquiry of "whether there is the need for a trial," the court must determine "whether a fair-minded jury *could* return a verdict for the plaintiff [or non-moving party] on the evidence presented." *Anderson*, 477 U.S. at 250, 252. Summary judgment

9

should be granted when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

## II. Section 1983

Section 1983 provides, in relevant part, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State… subjects, or causes to be subjected, any citizen of the United States… to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured." 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *see Patterson v. County of Oneida*, 375 F.3d 206,225 (2d Cir. 2004).

To assert a claim under § 1983, a plaintiff must allege "(1) the challenged conduct was attributable to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed by the U.S. Constitution." *Castilla v. City of New York*, 2013 WL 1803896, at *2 (S.D.N.Y. April 25, 2013); *see Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010). Therefore, a § 1983 claim has two essential elements: (1) the defendant acted under color of state law, and (2) as a result of the defendant's actions, the plaintiff suffered a denial of his federal statutory rights, or his constitutional rights or privileges. *See Annis v. County of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998); *Quinn v. Nassau Cty. Police Dep't*, 53 F. Supp. 2d 347, 354 (E.D.N.Y. 1999) (Section 1983 "furnishes a cause of action for the violation of federal rights created by the Constitution").

## DISCUSSION

Defendants argue that summary judgment is warranted for several reasons, including that (1) certain claims are time-barred by the applicable statute of limitations; (2) there is no inference of discrimination; and (3) there is no evidence of discriminatory intent. (*See generally* ECF No. 66, "Defs.' Mem.") Most notably, Defendants argue that Plaintiff fails to establish municipal liability as to the Village or personal involvement as to Chief Matturro, both of which are necessary to sustain liability under § 1983. (*Id*. at 17–22.) The Court will review these arguments in turn.

## I.    Statute of Limitations

Defendants first argue that certain of Plaintiff's claims arising before August 26, 2019 are time-barred under the statute of limitations applicable to § 1983 actions. (Defs.' Mem. at 3.)

Section 1983 does not provide a specific statute of limitations. Courts therefore routinely apply the statute of limitations governing personal injury actions under state law. *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013) (citing *Owens v. Okure*, 488 U.S. 235, 249–51 (1989); *Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002)). Because this action arises in New York, § 1983 claims are subject to a three-year statute of limitations. *See Pearl*, 296 F.3d at 79; N.Y. C.P.L.R. § 214 (McKinney 2026). However, in the context of employment discrimination suits, as here, the expiration of the limitations period does not preclude a plaintiff from relying on acts occurring outside the limitations period as background evidence in support of a timely claim. *Davis-Garett v. Urb. Outfitters, Inc.*, 921 F.3d 30, 42 (2d Cir. 2019) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)).

Plaintiff commenced this action on August 26, 2022. (Berlin Decl., Ex. A.) Because § 1983 claims are subject to a three-year statute of limitations, Plaintiff is time-barred from pursuing any discrimination claims arising before August 26, 2019. The Court therefore concludes that Plaintiff's claim that he was demoted due to his race is timely, as his demotion became effective

11

on August 9, 2022.  (Berlin Decl., Ex. AI.)  All other claims, including Plaintiff's allegation that he was denied certain trainings on the basis of race, are untimely.  (*See, e.g.*, Berlin Decl., Ex. A ¶¶ 9, 41–46.)  That said, in determining whether discrimination occurred with respect to Plaintiff's demotion claim, the Court will consider "relevant background evidence, such as statements by a decisionmaker or earlier decisions typifying the retaliation involved," to assess liability for the timely alleged act.  *Davis-Garett v. Urb.*, 921 F.3d at 42 (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 176–77 (2d Cir. 2005)).

## II.    Municipality Liability

The Court next analyzes whether Plaintiff has properly established municipality liability, as he is pursuing § 1983 claims against the Village and potentially Chief Matturro in his official capacity.

### A.  Claims Against Chief Matturro in His Official Capacity

The Complaint is silent as to whether Plaintiff is pursuing claims against Chief Matturro in his official or individual capacity.  (Berlin Decl., Ex. A ¶ 3.)  What is clear, however, is that Plaintiff is suing both Chief Matturro and the Village.  (*Id*. ¶¶ 2–3.)

It is well established that "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent[.]"  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 n.55 (1978).  The Second Circuit has likewise held that "a § 1983 suit against a municipal officer in his official capacity is treated as an action against the municipality itself."  *Kanderskaya v. City of New York*, 11 F. Supp. 3d 431, 435 (S.D.N.Y. 2014), *aff'd*, 590 F. App'x 112 (2d Cir. 2015) (quoting *Coon v. Town of Springfield, Vt.*, 404 F.3d 683, 687 (2d Cir. 2005)).  Indeed, where a plaintiff asserts "official-capacity claims against…

12

supervisory defendants… [they] are unnecessary because such claims duplicate the claims against the City[.]" *Holden v. City*, 2024 WL 218438, at *2 (S.D.N.Y. Jan. 19, 2024).

To the extent Plaintiff asserts claims against Chief Matturro in his official capacity, those claims are duplicative and redundant because Plaintiff already asserts claims against the Village. The Court therefore dismisses any official-capacity claims against Chief Matturro. *See Kanderskaya*, 11 F. Supp. 3d at 435 (dismissing claims against a municipal officer in his official capacity as redundant and duplicative); *Davis v. Stratton*, 360 Fed. App'x 182, 183 (2d Cir. 2010) ("The suit against the mayor and police chief in their official capacities is essentially a suit against the City, because in a suit against a public entity, naming officials of the public entity in their official capacities adds nothing to the suit."); *Phillips v. Cnty. of Orange*, 894 F. Supp. 2d 345, 385 n.35 (S.D.N.Y. 2012) ("[T]o the extent the Individual Defendants have been sued in their official capacities, these suits should be dismissed because the municipal entities are the real parties in interest.").

### B. Claims Against the Village

The Court next considers whether Plaintiff's claims against the Village are sufficient to establish municipal liability. Defendants contend that Plaintiff fails to state a basis for liability against the Village because he does not identify a formal policy or custom that allegedly caused a constitutional violation, nor does he identify a municipal policymaker with final policymaking authority. (Defs.' Mem. at 21.)

A municipality may be sued directly for constitutional violations under § 1983. *Monell*, 436 U.S. at 690 (1978). However, a municipality cannot be held liable for acts of "its employees below the policy-making level solely upon the basis of *respondeat superior*." *Byrd v. City of New York*, 2018 WL 259316, at *12 (S.D.N.Y. Jan. 2, 2018); *see also Johnson v. N.Y.C. Police Dep't*,

2016 WL 3277261, at *2 (2d Cir. June 8, 2016); *Littlejohn v. City of N.Y.*, 795 F.3d 297, 314–15 (2d Cir. 2015). To the contrary, to hold a municipality liable under § 1983 for the unconstitutional acts of its employees, the plaintiff must plead and prove that the violation of constitutional rights resulted from a municipal custom or policy. *See Connick v. Thompson*, 563 U.S. 51, 60 (2011); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478–83 (1986); *Johnson*, 2016 WL 3277261, at *2; *Littlejohn*, 795 F.3d at 314–15.

Although Plaintiff names the Village as a defendant, he fails to identify any municipal policy or custom that gives rise to the alleged harm. (*See generally* Berlin Decl., Ex. A.) Notably, Plaintiff does not even cite *Monell* in his opposition papers. (*See generally* Pl. Opp.) Instead, Plaintiff elaborates on how various Department personnel allegedly discriminated against him on the basis of race throughout his employment. (*Id.*) That is insufficient to establish municipal liability—even assuming a reasonable jury could conclude that an individual defendant violated Plaintiff's constitutional rights. "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy [that] can be attributed to a municipal policymaker." *Vasquez v. Cnty. of Rockland*, 2020 WL 883514, at *14 (S.D.N.Y. Feb. 24, 2020) (quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985)).

In an effort to establish municipal liability, Plaintiff contends that Chief Matturro is a municipal policymaker because he had "final authority" to promote and demote Plaintiff. (Pl. Opp. at 23.) As a preliminary matter, the record reflects that City Manager Cole—not Chief Matturro— approved Plaintiff's promotion and demotion. (Berlin Decl., Ex. AI.) In any event, whether an official possesses final policymaking authority is a question of law to be determined on the basis of state law. *See Gersbacher v. City of New York*, 2017 WL 4402538, at *16 (S.D.N.Y. Oct. 2,

14

2017) (citing *McMillian v. Monroe County*, 520 U.S. 781 (1997)).  "[T]he relevant legal materials[] includ[e] state and local positive law, as well as custom or usage having the force of law."  *Id*. (quoting *Jett v. Dallas Independent School District*, 491 U.S. 701, 737 (1989)).  As Defendants note, the relevant state law is N.Y. Unconsol. Law § 5711-q (McKinney 2026), which governs the employment of police officers in Westchester County, where the Village is located.  In relevant part, the statute provides that "[p]romotions of officers and members of such police forces shall be made by the board of trustees or municipal board," and that "[t]he board of trustees or municipal board shall have power and is authorized to adopt and make rules and regulations for the examination, hearing, investigation and determination of charges" with respect to discipline of police officers.  The statute does not confer such authority on the Chief of Police.  Nor does the Department's Rules and Regulations, which explicitly prescribe that "[t]he Chief of Police… shall make such recommendations to the Village Manager for the appointment, retention, discipline and removal of members of the Department as are required by the Village Manager, by law or by these Rules and Regulations."  (ECF No. 72, "Matturro Reply Aff.," Ex. 10 at 7.)  Chief Matturro is therefore not a municipal policymaker in this action.  *See Gersbacher*, 2017 WL 4402538, at *16 ("That [Police] Chief Esposito has the word 'Chief' in his title… [does] not make him a 'final policymaker' for the City as a matter of law."); *Russo v. City of Hartford*, 341 F. Supp. 2d 85, 108 (D. Conn. 2004) (holding that a police chief could not be deemed a final policymaker because he "remained accountable to department and city policy" and "the City Charter vest[ed] policymaking authority in the City Council and the City Manager").

Finally, although a plaintiff "need not identify an express rule or regulation" and may instead show "that a discriminatory practice of municipal officials was so persistent or widespread as to constitute a custom or usage with the force of law or that a discriminatory practice of

subordinate employees was so manifest as to imply the constructive acquiescence of senior policy-making officials," the allegations here do not meet that standard. *Baity*, 51 F. Supp. 3d at 435 (quoting *Patterson*, 375 F.3d at 226). A single instance of an individual allegedly being demoted because of race does not constitute a persistent or widespread practice, particularly where the demoted individual was replaced by a person within the same protected class.[2] Plaintiff also fails to present evidence "that the [Village] has a history of failing to hire [] officers who are racial minorities or failing to promote the same after their mandatory probationary periods." *Baity*, 51 F. Supp. 3d at 435. To the contrary, the record shows that Chief Matturro recommended that Officer Wanderman—who is half African American—to replace Plaintiff as Sergeant. (ECF No. 65, "Matturro Aff.," ¶ 68.) Plaintiff may argue that Officer Wanderman is not a member of the same protected class as he is, (Pl. Opp. at 18), but the Court finds that argument unpersuasive. *See, e.g.*, *DeJesus v. Dist. One Cmty. Educ. Council*, 2010 WL 3959624, at *4 (S.D.N.Y. Sept. 14, 2010) (employer replacing plaintiff, a Hispanic female, with a Hispanic and African American female defeated discrimination claim because the replacement was a member of plaintiff's protected class); *Khadaroo v. New York Presbyterian Hosp.*, 2012 WL 893180, at *6 (S.D.N.Y. Mar. 15, 2012) (an individual's "mixed race background qualifies as a protected class"); *Merritt v. Workers'*

---

[2] The fact that Plaintiff was replaced by Officer Wanderman—who is African American, notwithstanding Plaintiff's contention to the contrary—undermines any inference of discriminatory intent. *See White v. Pacifica Found.*, 973 F. Supp. 2d 363, 381 (S.D.N.Y. 2013) ("The fact that Plaintiff was replaced by a member of the same protected class further undermines any inference of discriminatory intent"); *DeJesus*, 2010 WL 3959624, at *4 ("The fact that plaintiff's immediate replacement is of the same protected classes effectively precludes plaintiff from establishing that her termination occurred under the requisite circumstances giving rise to an inference of discrimination."); *Fleming v. MaxMara USA, Inc.*, 2010 WL 1629705, at *9 (E.D.N.Y. Apr. 21, 2010) (plaintiff's discrimination claim was "clearly meritless" where plaintiff was replaced by a member of her own protected class and failed to present "'other facts from which the inference' of discrimination could be drawn"); *Pilgrim v. McGraw–Hill Cos., Inc.*, 599 F. Supp. 2d 462, 480 (S.D.N.Y. 2009) ("'Where no evidence giving rise to an inference of discrimination has been presented, the fact that a plaintiff is replaced with an individual within his protected class undermines his attempt to establish a *prima facie* case of discrimination.'") (quoting *Randolph v. CIBC World Mkts.*, 2005 WL 704804, at *12 (S.D.N.Y. Mar. 29, 2005)); *Montanile v. Natl. Broadcast Co.*, 211 F. Supp. 2d 481, 487 (S.D.N.Y. 2002) ("That a plaintiff is replaced by another in the same protected class weighs heavily against the inference that she suffered discrimination."), *aff'd*, 57 Fed. Appx. 27 (2d Cir. 2003).

*Comp. Comm'n*, 2025 WL 3097104, at \*1 (D. Conn. Nov. 6, 2025) (an individual "is a member of a protected class, as a woman of mixed race and light Black skin").

For these reasons, Plaintiff's claims against the Village and Chief Matturro in his official capacity fail to establish municipal liability and are dismissed.

### III.    Individual Claims Against Chief Matturro

Before addressing the merits of Plaintiff's discrimination claims, the Court must first determine whether Chief Matturro—the only named individual defendant—was personally involved in the alleged discrimination. Defendants contend that Plaintiff's § 1983 claims fail because Chief Matturro lacked personal involvement in his capacity as a supervisor of the Department. (Defs.' Mem. 17–19.) In response, Plaintiff advances two theories to establish personal involvement: (1) Chief Matturro recommended Plaintiff's demotion, which was subsequently approved by the Village Manager, and (2) Chief Matturro denied Plaintiff access to Department training. (Pl. Opp. at 21–22.) The Court addresses each theory in turn.

When assessing supervisory liability in § 1983 claims, the Second Circuit has explained that "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). It follows that a plaintiff "must establish an individual defendant's personal involvement in the claimed violation to find him liable in his individual capacity under § 1983." *Kellman v. Metro. Transp. Auth.*, 8 F. Supp. 3d 351, 392 (S.D.N.Y. 2014). In the context of supervisory liability, an official personally participates in challenged conduct not only through direct participation, but also by: (1) failing to take corrective action; (2) creating a policy or custom fostering the conduct; or (3) engaging in grossly negligent supervision or deliberate indifference to the rights of others. *Urquhart v. Metro.*

17

*Transp. Auth.*, 975 F. Supp. 2d 320, 343 (S.D.N.Y. 2013) (quoting *Rolon v. Ward*, 345 Fed. Appx. 608, 611 (2d Cir. 2009)).

Beginning with the events surrounding Plaintiff's demotion, Chief Matturro's involvement appears limited. On October 15, 2021, he informed Plaintiff that he would be promoted to Sergeant and expressed confidence in Plaintiff's ability to succeed.[3] (Berlin Decl., Ex. O.) After learning of the sexual harassment allegations made against Plaintiff, Chief Matturro met with him on June 1, 2022, and advised that an investigation would be conducted—an investigation he did not personally undertake. (Berlin Decl., Ex. W at 2.) Instead, Lt. DelBene conducted the investigation—an individual not named as a defendant in this action. (*Id*. at 2; Matturro Aff. ¶ 56.) Lt. DelBene produced two investigatory reports, and accompanying memoranda, based on information provided by Department personnel, who likewise were not named as defendants. (Berlin Decl., Exs. AD–AF.) After reviewing Lt. DelBene's reports and discussing their contents with him, Chief Matturro met again with Plaintiff on July 22, 2022, and, following Plaintiff's denial of wrongdoing, informed him that he would recommend his demotion to Village Manager Cole.[4] (Berlin Decl., Ex. W at 5.) Although Plaintiff identifies several alleged deficiencies in Lt. DelBene's investigatory reports, it is undisputed that Chief Matturro did not participate in conducting the investigation. (*Id*. at 2–5.)

---

[3] Plaintiff asserts that, during this conversation, Chief Matturro called him lazy in a racially discriminatory manner. (Pl. Opp. at 2.) However, Plaintiff's claim is belied by the record. To the contrary, Chief Matturro stated that Plaintiff was going to be a "new sergeant" and that he understood he was going to "make mistakes." (Defs.' Ex. O.) Chief Matturro further indicated that it was only natural for Plaintiff to make mistakes, but that he did not want to see Plaintiff "making a mistake because of a lack of laziness." (*Id*.)

[4] Plaintiff's argument is further weakened by the fact that Chief Matturro was the official who recommended Plaintiff's promotion to Village Manager Cole. The Second Circuit has explained that "where the person who made the decision to [demote] was the same person who made the decision to [promote], it is difficult to impute to h[im] an invidious motivation that would be inconsistent with the decision to [promote]." *Leon v. Columbia Univ. Med. Ctr.*, 2013 WL 6669415, at *8 (S.D.N.Y. Dec. 17, 2013), *aff'd*, 597 F. App'x 30 (2d Cir. 2015) (quoting *Schnabel v. Abramson*, 232 F.3d 83, 92 (2d Cir. 2000)). The principle is "especially so when the [demotion] has occurred only a short time after the [promotion]," as is the case here. *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997).

Plaintiff contends that Chief Matturro became aware of Plaintiff's alleged race-based supervisory issues on June 1, 2022, when Plaintiff informed him that he had not been provided with the tools necessary to succeed as a Sergeant. (Pl. Aff. ¶ 12.) But Plaintiff cannot "simply allege[] that []he made [Chief Matturro] aware of the alleged [racial] harassment and denial of opportunities and [then argue] that he failed to take appropriate corrective action." *Arnold v. Town of Camillus, New York*, 662 F. Supp. 3d 245, 264 (N.D.N.Y. 2023). That is insufficient to establish that Chief Matturro has personal involvement in the alleged racial discrimination against Plaintiff. *Id*. Insofar as Plaintiff contends that Chief Matturro was aware of a broader history of alleged racial discrimination, that claim is belied by the record, which reflects that Chief Matturro first became aware of such concerns on June 1, 2022, when he met with Plaintiff to discuss the sexual harassment allegations against him. (Pl. Aff. ¶ 12.) The record also reflects that Plaintiff raised these concerns with Lt. DelBene, Det. Lt. Kellaher, and Lt. Boris Grgas—none of whom he named as defendants in this action. (*Id*. ¶¶ 68–72.)

Nor does Chief Matturro's recommendation to Village Manager Cole alter the analysis. "The direct physical participation of the defendant in the constitutional violation is not alone a sufficient basis for holding the defendant liable if the defendant had no awareness or notice of the facts that rendered the action illegal." *White v. New York State Off. of Child. & Fam. Servs.*, 2017 WL 1011485, at *3 (N.D.N.Y. Mar. 14, 2017) (quoting *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001)). Chief Matturro cannot be personally liable where he merely made a "decision in reliance on the observations and recommendations of the… officers directly in contact with [him]." *Rodriguez v. City of New York*, 644 F. Supp. 2d 168, 199 (E.D.N.Y. 2008). As discussed above, Chief Matturro did not conduct the investigation—Lt. DelBene did. (Berlin Decl., Ex. W at 2.) There is also no evidence that Chief Matturro's actions relating to Plaintiff's demotion were

19

"motivated by considerations of Plaintiff's race." *Griffith v. New York State Dep't of Health*, 2017 WL 11286181, at \*11 (N.D.N.Y. Sept. 27, 2017). To the contrary, the record reflects that Chief Matturro wanted Plaintiff to succeed as Sergeant. (Berlin Decl., Ex. O.)

Plaintiff's argument that he was denied Department training on the basis of race fares no better. Although Plaintiff provides no citations, he contends that Chief Matturro had full discretion over Department training. (Pl. Opp. at 22.) The Court disagrees. According to Plaintiff, Chief Matturro testified that he participated in denying all of Plaintiff's requests for training. (*Id*.) However, Chief Matturro did not testify that he was directly involved in all decisions regarding Plaintiff's training. Rather, Chief Matturro stated that he was directly involved only with an EMT training—which Plaintiff attended—and that he "could have been" involved with others. (Matturro Dep. Tr. 140:21–141:10.) Chief Matturro also clarified his earlier testimony and confirmed that he did not sign off on all trainings. (*Id*. at 147:13–14.) Plaintiff cannot treat Chief Matturro's testimony as a blanket statement that he personally made all decisions concerning Plaintiff's training. Plaintiff also affirms that he "did not report directly to Chief Matturro" and instead raised his concerns "regarding inequities in training directly" to Lt. Kellaher, Sgt. Grgas, and Lt. DelBene. (Pl. Aff. ¶ 53.)

What is most fatal to Plaintiff's claim is that, despite asserting that he was denied several trainings on the basis of race, he was nevertheless promoted to Sergeant. (Berlin Decl., Ex. O.) Indeed, the "denial of professional training opportunities may constitute an adverse employment action, but only where an employee can show 'material harm' from the denial, 'such as a failure to promote or a loss of career advancement opportunities.'" *Kellman*, 8 F. Supp. 3d at 374 (quoting *Trachtenberg v. Dep't of Educ. of N.Y.C.*, 937 F. Supp. 2d 460, 468 (S.D.N.Y. 2013)). Plaintiff cannot raise an issue of material fact when he was, in fact, promoted. Furthermore, a majority of

the trainings that Plaintiff alleges were denied to him occurred prior to his promotion—and outside the statute of limitations period. (*See, e.g.*, Pl. Aff. ¶¶ 40–42, 45.) Plaintiff was also permitted to attend a 120-hour training program tailored to his new responsibilities after his promotion. (Pl. Aff., Ex. 14 at 34.) Even accepting Plaintiff's allegations, his contentions fail as a matter of law. *See, e.g.*, *Kellman*, 8 F. Supp. 3d at 393 (granting summary judgment where plaintiff alleged that the Chief of Police Department "signed off on promotion orders and discipline, took no steps to investigate Plaintiff's [] Complaint, and made the aforementioned [derogatory] comment"); *Urquhart*, 975 F. Supp. 2d at 344 (same); *Arnold*, 662 F. Supp. 3d at 264 (same). Given that Chief Matturro was not personally involved in the investigation regarding Plaintiff's demotion, and his limited involvement in Department training was speculative and did not demonstrate discriminatory intent, he cannot be held individually liable under § 1983. The Court therefore dismisses all individual claims against Chief Matturro.

**CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED. The Court respectfully directs the Clerk of Court to enter judgment in favor of Defendants the Village of Scarsdale and Police Chief Andrew Matturro, terminate the motion at ECF No. 62, and close this case.

SO ORDERED.

Dated: March 9, 2026
      White Plains, NY

_____
Nelson S. Román, U.S.D.J.

21